Trump v Trump (2023 NY Slip Op 23133)

[*1]

Trump v Trump

2023 NY Slip Op 23133

Decided on May 3, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on May 3, 2023
Supreme Court, New York County

Donald J. Trump, Plaintiff,

against
Mary L. Trump, THE NEW YORK TIMES COMPANY D/B/A THE NEW YORK TIMES, SUSANNE CRAIG, DAVID BARSTOW, RUSSELL BUETTNER, JOHN DOES 1 THROUGH 10, and ABC CORPORATIONS 1 THROUGH 10., Defendant.

Index No. 453299/2021

Attorneys for the Plaintiff Donald J. Trump
Michael T. Madaio, Habba Madaio & Associates LLP 
Alina Habba, Habba Madaio & Associates LLP 
Attorneys for the Defendant The New York Times Company
David E. McCraw, NYT Company
Demetri Blaisdell, NYT Company 
Attorneys for the Defendant David Barstow:
Chris Duffy, Vinson & Elkins
Thomas S. Leatherbury, Thomas S. Leatherbury Law, PLLC

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 003) 41, 42, 43, 44, 45, 46, 56, 57, 58, 59, 67, 75 were read on this motion to/for DISMISS.
In this lawsuit, Donald J. Trump ("plaintiff"), a former president of the United States, asserts various claims against his niece, Mary L. Trump ("Mary Trump"), The New York Times Company d/b/a The New York Times ("The Times"), the individually named journalists Susanne Craig ("Craig"), David Barstow ("Barstow") and Russell Buettner ("Buettner"), along with unnamed John Does and unnamed ABC Corporations (collectively "defendants"), for their actions related to the publishing of The Times' 2018 article, "Trump Engaged in Suspect Tax Schemes as He Reaped Riches from His Father." In motion sequence number 003, The Times, Craig, Barstow and Buettner move, pursuant to CPLR 3211(a)(1), (a)(7), and (g), to dismiss each of the claims asserted against them and for an order, based on New York's amended anti-SLAPP law, directing plaintiff to pay moving defendants' attorneys' fees and costs incurred defending against plaintiff's claims.
The crux of plaintiff's claim is that a reporter for The Times caused his niece, Mary Trump, to take 20-year-old tax and financial documents held by her lawyer and disclose them in violation of a 2001 settlement agreement. The Times, it is alleged, then used those documents to publish a lengthy article in 2018 that reported that plaintiff had allegedly participated in dubious tax and other financial schemes during the 1990s. In this action, plaintiff does not specifically dispute the truth of any statements made in the article. Rather, plaintiff alleges that The Times defendants' interaction with Mary Trump resulted in her breach of certain confidentiality provisions of the 2001 settlement agreement, rendering The Times and its journalists liable for tortious interference with contract, aiding and abetting tortious interference with contract, unjust enrichment, and/or negligent supervision. Plaintiff demands $100 million in damages.
Plaintiff's claims against The Times defendants, as an initial matter, fail as a matter of constitutional law. Courts have long recognized that reporters are entitled to engage in legal and ordinary newsgathering activities without fear of tort liability — as these actions are at the very core of protected First Amendment activity. Plaintiff's claims also fall short inasmuch as they fail to assert the necessary elements of tortious interference, unjust enrichment, and negligent supervision. More particularly, plaintiff's tortious interference claim is dismissed because The Times' purpose in reporting on a story of high public interest constitutes justification as a matter of law. Plaintiff's unjust enrichment claim fails because it is duplicative of his other claims. His claim for negligent supervision, moreover, is dismissed due to the lack of any allegations that The Times reporters committed any wrongful act falling outside of the scope of their normal [*2]work duties. Finally, the newly amended anti-SLAPP law mandates that plaintiff pay defendants' attorneys' fees and costs because plaintiff's claims plainly constitute a strategic lawsuit against public participation, and, contrary to plaintiff's argument, New York's anti-SLAPP law is directed to more than just defamation-based lawsuits. 

BACKGROUND
 
 Factual Background
 

Shortly after the death of Frederick C. Trump — plaintiff's father and Mary Trump's grandfather — disputes arose among various members of the Trump family regarding the estates of Frederick and his late wife, Mary Anne Trump (NYSCEF Doc. No. 1, complaint at 15-19). Mary Trump, joined by her brother Fred Trump III (individually and on behalf of his son, William Trump), his wife, and their mother (collectively, the "objectors"), filed objections to the probate of both estates against co-executors plaintiff, Robert Trump, and Maryanne Trump Barry (collectively, the "proponents") (id. at 17). The objectors also commenced litigation seeking to reinstate the health insurance that the proponents cut off in alleged retaliation for their objections to the probate proceedings (id. at 18).
The parties to the estate proceedings engaged in voluminous discovery, which, among other things, produced certain tax and financial records concerning plaintiff. Then, in April of 2001, the parties executed a settlement agreement to "fully, finally, and globally" resolve the filed actions and proceedings (id. at 23; see also NYSCEF Doc. No. 26, Ex. 9, the settlement agreement). The agreement's stated purpose was to effect a "compromise[] and settle[ment], on a 'global basis' in order to resolve all of [the parties'] differences pertaining to two (2) probate proceedings; [an] insurance case; partnership and corporate interests; as well as their interests in two (2) inter vivos trusts" (the settlement agreement at 5). Under the agreement, the objectors also acquired Mary Trump's interests in the family business.
Paragraphs 2 and 3 of the agreement contain reciprocal confidentiality provisions. Paragraph 2 specifically provides that without the express consent of all three proponents — including plaintiff — objectors:
"shall not disclose any of the terms of [the Settlement Agreement], and in addition shall not directly or indirectly publish or cause to be published, any diary, memoir, letter, story, photograph, interview, article, essay, account, or description or depiction of any kind whatsoever, whether fictionalized or not, concerning their litigation or relationship with the 'Proponents/Defendants' or their litigation involving the Estate of FRED C. TRUMP, and the Estate of MARY ANNE TRUMP, or assist or provide information to others in connection therewith" (id. at 27). Paragraph 3, on the other hand, binds plaintiff and the other proponents to extend the same promises concerning confidentiality to the objectors, including Mary Trump (settlement agreement paragraph 3). Defendants contend that, while the confidentiality provisions state that the agreement itself is confidential and that the parties may not discuss their relationship in the context of the estate disputes, the provisions do not extend confidentiality to documents exchanged during discovery in the estate proceedings.
Years later, as the public's interest in plaintiff began to grow — eventually culminating with his entry into national politics — The Times began scrutinizing some of plaintiff's public statements regarding his personal finances and entrepreneurial endeavors (NYSCEF Doc. No. 46 [*3]at 4). While running for President, plaintiff promised to disclose his tax returns (id.). [FN1]
His failure to do so—even after his election—fueled speculation that the tax returns would contradict his public statements about his finances (id.). Then, in 2016, The Times obtained portions of plaintiff's tax returns and published an article revealing that he may have avoided taxes for nearly two decades (complaint at 34-36). The publication of the article further sparked public debate, and since then, plaintiff's taxes have become a frequent subject of media attention (id.).
At The Times, Craig, Barstow, and Buettner were specifically tasked with covering plaintiff's financial affairs (id. at 7-9). As part of their ongoing efforts to report on the topic, in 2017, Craig approached Mary Trump at her home to seek information for "a very important story about [the Trump] family finances" (id. at 39). Mary Trump initially declined to speak with Crag (id. at 40), but Craig continued reaching out to Mary Trump, assuring her that her cooperation could help "rewrite the history of the President of the United States" (id. at 43).
Sometime after the visit from Craig, Mary Trump changed her mind and decided to call Craig. She and Craig discussed documents from the estate disputes that had remained in Mary Trump's client file at the offices of her attorneys, the Farrell Fritz law firm. To communicate, Mary Trump and Craig used anonymous cell phones, also known as burners (id. at 46-47). Mary Trump initially considered the possibility that she might have to "smuggle" these documents out of her attorney's office, but instead she received permission from her attorneys to take an extra copy from them (id. at 45, 48). Mary Trump then shared those documents with The Times (id. at 49). Mary Trump never received authorization from any of the proponents for such actions (id. at 50).
Plaintiff contends that these actions constitute a blatant breach of paragraph 2 of the confidentiality provision of the settlement agreement. Plaintiff also contends that The Times was aware that Mary Trump's actions would constitute a violation of the settlement agreement. In fact, the complaint alleges, Craig made such acknowledgments publicly (id. at 58). According to plaintiff, Mary Trump would not have breached the confidentiality provision were it not for The Times' persistent efforts (id. at 59). Therefore, plaintiff contends, The Times has tortiously interfered with the contract between Mary Trump and plaintiff, without justification, to plaintiff's detriment.
Then, on October 2, 2018, The Times published an article, credited to Barstow, Craig, and Buettner, entitled "Trump Engaged in Suspect Tax Schemes as He Reaped Riches from His [*4]Father" (the "2018 article") (id. at 67). The article's subject matter was described immediately below the headline: "The president has long sold himself as a self-made billionaire, but a Times investigation found that he received at least $413 million in today's dollars from his father's real estate empire, much of it through tax dodges in the 1990s" (NYSCEF Doc. No. 45, Ex. C, at 2). The 13,000-word article explained in detail the various methods plaintiff allegedly used to "dodge taxes," including "set[ting] up a sham corporation to disguise millions of dollars in gifts"; "tak[ing] improper tax deductions worth millions more"; and "formulat[ing] a strategy to undervalue his parents' real estate holdings by hundreds of millions of dollars on tax returns" (complaint at 68-70). The stock price of The Times rose 7.4% during the week of the publication of the article (id. at 73).
The instant action
On September 21, 2021, plaintiff filed this lawsuit. He brings four claims against The Times and the three reporter defendants: tortious interference, aiding and abetting tortious interference, unjust enrichment, and negligent supervision. Although plaintiff does not specify an identifiable harm, he demands an award of actual, compensatory, and incidental damages in an amount to be determined at trial, but alleged to be no less than $100,000,000.
In motion sequence number 003, The New York Times and its reporters move, pursuant to CPLR 3211(a)(1), (a)(7), and (g), to dismiss each of the claims asserted against them and for an order, based on New York's amended anti-SLAPP law, directing plaintiff to pay the moving defendants the attorneys' fees and costs spent defending against plaintiff's claims.

DISCUSSION
1. Does New York's anti-SLAPP law apply to plaintiff's claims? 
New York's amended anti-SLAPP statute applies to the claims at hand because plaintiff's causes of action, as stated in the complaint and as asserted against The Times and its reporters, constitute a strategic lawsuit against public participation. Moreover, and contrary to what plaintiff argues, the anti-SLAPP statute is not limited only to defamation claims.
SLAPP suits—or strategic lawsuits against public participation—are characterized as having little legal merit but "filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future" (600 W. 115th St. Corp. v. Von Gutfeld, 80 NY2d 130, 137 [1992]). The law, as amended, applies to suits that target "action involving public petition and participation" as well as any "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest" (NY Civ Rights Law § 76-a[1][a][2]). Once triggered, plaintiffs can avoid dismissal only if they establish that they have a "substantial basis in law" for their claims or "a substantial argument for an extension, modification or reversal of existing law" (CPLR 3211[g][1]). If a defendant prevails in securing dismissal of the case, it is entitled to seek reimbursement of its costs and attorneys' fees from the plaintiff, along with compensatory and punitive damages (NY Civ Rights Law § 70-a[1][a]).
The law was originally enacted in 1992 as a response to "rising concern about the use of civil litigation, primarily defamation suits, to intimidate or silence those who speak out at public meetings against proposed land use development and other activities requiring approval of public boards" (600 W. 115th St. Corp., 80 NY2d at 137). The original anti-SLAPP statute initially limited its application to instances where speech was aimed toward a public applicant or [*5]permittee, i.e. an individual who applied for a permit, zoning change, lease, license, or other similar document from a government body. As applied, the statute was "strictly limited to cases initiated by persons or business entities embroiled in controversies over a public application or permit, usually in a real estate development situation" (Sponsor's Memorandum, Bill Jacket, L 2020, ch 250).
In 2020, however, the New York legislature amended the anti-SLAPP statute to "broaden the scope of the law and afford greater protections to citizens" beyond suits arising from applications to the government (29 Mable Assets, LLC v. Rachmanov, 192 AD3d 998, 1000 [2nd Dep't 2021]). Among other changes, Civil Rights Law § 76-a was amended to expand the definition of an "action involving public petition and participation" to also include claims based upon "any communication in a place open to the public or a public forum in connection with an issue of public interest" (NY Civ Rights Law § 76-a[1][a][1]). The amended law further provides that "public interest" "shall be construed broadly and shall mean any subject other than a purely private matter" (NY Civ Rights Law § 76-a[1][d]). Additionally, Civil Rights Law § 70-a was amended to mandate, rather than merely permit, the recovery of costs and attorneys' fees upon demonstration "that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for extension, modification or reversal of existing law" (NY Civ Rights Law § 70-a[1][a]).
The revised anti-SLAPP law was specifically designed to apply to lawsuits like this one. In fact, among other reasons, plaintiff's history of litigation — that some observers have described as abusive and frivolous [FN2]
— inspired the expansion of the law. After the bill was signed into law, one of its authors issued a press release stating:
"For decades, Donald Trump, his billionaire friends, large corporations and other powerful forces have abused our legal system by attempting to harass, intimidate and impoverish their critics with strategic lawsuits against public participation, or 'SLAPP' suits. This broken system has led to journalists, consumer advocates, survivors of sexual abuse and others being dragged through the courts on retaliatory legal challenges solely intended to silence them. Today, New York 'SLAPPs back' with our new legislation (S.52A/A.5991A) that expands anti-SLAPP protections, thereby strengthening First Amendment rights in New York State, the media capital of the world"
(Press Release, Sen Brad Hoylman, Legislature Passes Legislation to Crack Down on Frivolous "SLAPP" Lawsuits Used to Silences Critics [July 22, 2020], https://www.nysenate.gov/newsroom/press-releases/brad-hoylman/trump-attacks-free-press- legislature-passes-senator-hoylman-and).
Nonetheless, plaintiff argues that his claims do not fall within the purview of the anti-SLAPP law since the claims asserted against The Times do not relate to communication in a public forum in connection with an issue of public interest. Plaintiff argues that he is not suing The Times for its publication of the 2018 article, but for its actions in inducing its co-defendant Mary Trump to breach her confidentiality agreement and turn over the confidential records. These actions constitute a stand-alone tort that must be viewed separately and apart from the subsequent publication of The Times article.
Moreover, plaintiff argues that the anti-SLAPP law is not applicable to claims other than for defamation — a cause of action which plaintiff did not assert against The Times. To support this argument, plaintiff cites to Lindberg v. Dow Jones & Company, where a group of journalists were sued for defamation and tortious interference for their role in inducing a source to breach a confidentiality agreement in furtherance of publishing a news article (2021 WL 3605621 [SDNY 2021]). According to plaintiff, when the defendants in that action attempted to invoke the anti-SLAPP law, the court applied it solely in the context of plaintiff's defamation claim, while declining to apply it to the plaintiff's tortious interference claim. Plaintiff further claims that New York state courts have also declined to apply the newly amended version of the anti-SLAPP law to claims of tortious interference with contract (citing RSR Corp. v. LEG Q LLC, 2021 WL 4523615 [NY Sup Ct 2021]); Aristocrat Plastic Surgery v. Silva, No. 153200/2021 [NY Sup Ct 2021) [finding that an action involving claim for tortious interference with contract did "not fall within the ambit of New York's anti-SLAPP law"]).
Finally, plaintiff also argues that this interpretation of the anti-SLAPP law is also in line with the legislative intent. The New York legislature, when initially passing the anti-SLAPP law, identified SLAPP suits as "suits brought purposefully to restrict freedom of speech" and noted that they "ordinarily arise out of defamation suits" (see NY Leg Mem A09005L). True to this notion, the legislature allegedly referred to SLAPP suits and defamation suits interchangeably. Therefore, according to plaintiff, there is nothing in the legislative history suggesting that the anti-SLAPP law was ever intended to apply to claims such as tortious interference.
Plaintiff's arguments fail on all counts. First, even if the complaint, as asserted against The Times, did not target the 2018 article's publication, the claims stated therein are still subject to New York's anti-SLAPP law. The law was specifically amended to protect, not just the communication in the public forum that an anti-SLAPP plaintiff may wish to target, but also the "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest" (NY Civ Rights Law § 76-a[1][a][2]). And there can be no dispute that newsgathering certainly qualifies as conduct in furtherance of the exercise of one's right to free speech (see Nicholas v. Bratton, 376 F Supp 3d 232, 279 [SDNY 2019] ["Entrenched in Supreme Court case law is the principle that the First Amendment's protections for free speech include a constitutionally protected right to gather news"]); Matter of Holmes v. Winter, 22 NY3d 300, 310 [2013] ["New York public policy as embodied in the Constitution and our current statutory scheme provides a mantle of protection for those who gather and report the news—and their confidential sources— that has been recognized as the strongest in the nation"]).
Moreover, contrary to what plaintiff argues, New York's anti-SLAPP law is not limited to defamation claims. The only anti-SLAPP provision limited to defamation-type claims is Civil Rights Law §76-a (2), which requires "clear and convincing evidence" of actual malice and is expressly limited to those claims "where the truth or falsity of such communication is material to [*6]the cause of action at issue." That provision is not at issue here. Its express limitation to defamation-like claims, however, shows that the two anti-SLAPP provisions that are at issue and have no such limitation— the burden-shifting provision in CPLR 3211(g) and the fee-shifting provision in Civil Rights Law §70-a—are generally applicable to all actions involving "public petition and participation."
Plaintiff cites multiple cases in support of his assertion that New York courts have declined to apply the newly amended version of the anti-SLAPP law to claims of tortious interference with contract. But the cases plaintiff cites do not stand for such a proposition. In fact, the Appellate Division, First Department, in reversing one of the cases that plaintiff relies upon, expressly held otherwise. Plaintiff cites to Aristocrat Plastic Surgery v. Silva to support his claim that the anti-SLAPP law is limited to defamation claims (2021 WL 3703916). In Aristocrat, after a plastic surgery patient posted negative online reviews of plastic surgeon and his practice, a surgeon commenced an action against patient, asserting claims for defamation, tortious interference, intentional infliction of emotional distress, and prima facie tort. The patient moved to dismiss, and also moved for attorney fees and punitive damages pursuant to §70-a and 76-a(1)(a)(1) — the same provisions that The Times invokes herein.
And although the lower court granted the patient's motion to dismiss, it denied the patient's motion for attorney fees, stating that an action involving a claim for tortious interference did "not fall within the ambit of New York's anti-SLAPP law" (id.). The patient appealed the lower court's decision. On appeal, which was decided after the parties in this case submitted their briefs, the First Department unanimously held that the defendant in that matter was entitled to seek damages and attorneys' fees under Civil Rights Law §§ 70-a and 76-a(1)(a)(1), as the surgeon's claims asserted against the patient "fall under the ambit of the amended anti-SLAPP law" (Aristocrat Plastic Surgery, P.C. v. Silva, 206 AD3d 26, 32 [1st Dep't 2022]). The Appellate Division did not make any distinction between claims for defamation and tortious interference, but, instead, overturned the lower court's holding in its entirety as it related to the court's denial of the patient's anti-SLAPP motion for attorneys' fees and damages. Therefore, in this court's assessment, the First Department's holding in Aristocrat forecloses plaintiff's argument that the anti-SLAPP law applies only to defamation claims.
Further, plaintiff's reliance on Lindberg v. Dow Jones & Co. is irrelevant because the court in that case dealt with an interpretation of Civil Rights Law §76-a (2), [FN3]
 while the defendants herein rely only on § 70-a(1)(a). Plaintiff's reliance on RSR Corp. v. LEG Q LLC is similarly misplaced. In RSR Corp., the court dismissed an anti-SLAPP counterclaim in a corporate board dispute, not because the anti-SLAPP law does not apply to claims for tortious interference, but because the defendant there provided no evidence that the defendant's years-old statements were connected to the legal action in question.
In addition to relying on inapposite cases, plaintiff does nothing to contradict or distinguish several of the cases that moving defendants cite in support of their argument that the anti-SLAPP law applies to claims other than defamation (see, e.g., Goldman v. Reddington, 2021 WL 4099462, at *4 [EDNY 2021] [applying anti-SLAPP's burden-shifting and fee-shifting provision to tortious interference claim]; Mable Assets, LLC v. Rachmanov, 192 AD3d 998, 1000-01 [2nd Dep't 2021] [applying pre-amendment anti-SLAPP law to plaintiff's tortious interference claim]; Bennett v. Towers, 982 NYS 2d 843, 848 [Sup Ct Nassau Cnty 2014] [same]).
Finally, the lack of case law support for a categorical approach endorsed by plaintiff, that the anti-SLAPP law must apply only to defamation claims, also comports with the 2020 amendment's legislative history. The anti-SLAPP law was expanded in 2020 specifically to target litigation that "attempt[ed] to chill free speech," regardless of a plaintiff's particular claims (see S52A/A5991A, 2019-2020 Leg Sess [NY 2020] [explaining that the pre-amendment statute "failed to accomplish [its] objective" of providing "the utmost protection for free exercise of speech" [quoting L 1992 Ch 767]). And as set forth earlier—the legislature's expansive changes to the law were, in part, specifically designed to prevent plaintiff himself from filing lawsuits like this one to retaliate against journalists for their reporting. Therefore, it would be unreasonable to conclude that plaintiff could evade the application of a law specifically designed to stop frivolous lawsuits aimed at chilling free speech simply by pleading non-defamation claims. If the legislators, in passing the amendment, intended to protect free speech by shielding from frivolous lawsuits those who may wish to speak, then it stands to reason that the legislators intended to offer protections against any lawsuit aimed at interfering with such free speech, regardless of the type of claim asserted in such lawsuit. 
Accordingly, because, in this court's assessment, the anti-SLAPP law applies to the claims at hand, plaintiff can avoid dismissal of those claims only if he can establish a "substantial basis in law" for his claims or "a substantial argument for an extension, modification or reversal of existing law" (CPLR 3211[g][1]). Additionally, because the anti-SLAPP law is triggered, if, in the following paragraphs, The Times defendants prevail in securing dismissal of the case, they would be entitled to seek reimbursement of their costs and attorneys' fees from plaintiff (NY Civ Rights Law § 70-a[1][a]).
2. Does the New York Constitution protect The Times' right to solicit information from its source, even when its strategy of obtaining information involves encouraging its source to breach her contractual confidentiality obligations?
The Times defendants' conduct is protected by New York law, which is exceedingly protective of free speech rights (see Immuno AG v. Moor-Jankowski, 77 NY2d 235, 249-50 [1991]. In fact, New York courts have consistently rejected efforts to impose tort liability on the press based on allegations that a reporter induced a source to breach a non-disclosure agreement.
The New York State Constitution, as evidenced by the language in Article I, § 8, provides strong protections for free speech. "Every citizen may freely speak, write and publish his or her sentiments on all subjects" (NY Const art I, subsection 8). This principle has been reaffirmed by New York courts on numerous occasions. The New York Court of Appeals, indeed, has boasted of New York's "own exceptional history and rich tradition" of protecting the freedom of the press, whether under the State Constitution or based on New York's common law (Immuno AG, 77 NY2d at 249-50). To that end, New York courts are especially vigilant "in [*7]safeguarding the free press against undue interference" (id.). This tradition extends to "the sensitive role of gathering and disseminating news of public events," which receives "the broadest possible protection" under state law (id.). Thus, "[t]he protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment," including where a case could impact "[t]he ability of the press freely to collect and edit news" (O'Neill v. Oakgrove Constr., Inc., 71 NY2d 521, 526 [1988]).
That stated, the New York tradition of protecting the freedom of the press to collect news is also consistent with how the First Amendment has been interpreted. For example, in Smith v. Daily Mail Publishing Co., the Supreme Court of the United States declared that "[If] a newspaper lawfully obtains truthful information about a matter of public significance, then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order" (443 US 97, 103 [1979]). Applying this principle, the Supreme Court has routinely rejected tort lawsuits premised on the publication of information that was obtained through ordinary newsgathering activities (see Fla Star v BJF, 491 US 524, 541 [1989] [rejecting civil liability for newspaper that lawfully obtained and published the identity of crime victim in contravention of a statute]). In Barnicki v. Vopper, a radio station was sued for broadcasting an illegally recorded phone call between a school district's union officials (532 US 519 [2001]). The Supreme Court reaffirmed the principle stated in Smith v. Daily Mail, by holding that, because the radio station had not itself illegally recorded the call, it had no liability, given the First Amendment's protections (id. at 525-28).
Plaintiff argues that The Times' conduct is not constitutionally protected because its actions were tortious in nature and it is well established that "[c]rimes and torts committed in news gathering are not protected by the First Amendment" (Le Mistral, Inc. v. Columbia Broadcasting System, 61 AD2d 491, 494 [1st Dep't 1978]). According to plaintiff, The Times defendants' activities, even if considered within the scope of activities covered by the New York Constitution, were nonetheless coercive, harassing, vindictive, misleading, purposeful, and in blatant disregard of the plaintiff's contractual rights, and, as such, deserve no protection.
Plaintiff is mistaken. His characterization of The Times' actions as tortious does not, on its own, remove the constitutional protections that are extended to the press during the process of ordinary newsgathering (see, e.g., Nicholas v. Bratton, 376 F Supp 3d 232, 279 [SDNY 2019] ["[E]ntrenched in Supreme Court case law is the principle that the First Amendment's protections for free speech include a constitutionally protected right to gather news"]; Higginbotham v. City of NY, 105 F Supp 3d 369, 379 [SDNY 2015] "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw" quoting First Nat'l Bank of Bos v. Bellotti, 435 US 765, 783 [1978]). This protection is based on the longstanding recognition that "without some protection for seeking out the news, freedom of the press could be eviscerated" (Branzburg v. Hayes, 408 US 665, 681 [1972]).
Plaintiff argues that these constitutional protections are irrelevant where, as here, the lawfulness of the conduct is expressly and vehemently disputed in the complaint. Indeed, the complaint does characterize defendants' conduct as "fraudulent," "willful, wanton, outrageous [and] motivated by spite, malice and vindictiveness" (complaint at 131). But these are conclusory statements that must be supported by specific factual allegations in order to have any weight in evaluating a motion to dismiss (LoPresti v. Mass Mut Life Ins Co., 30 AD3d 474, 475-[*8]76 [2d Dep't 2006] [affirming dismissal of tortious interference claim where "the allegation that the respondents' actions were wrongful or unlawful were conclusory and without support"]). Thus, the question before this court is not whether the complaint characterizes The Times' conduct as tortious, but whether the conduct it alleges—persuading Mary Trump to provide documents from her client file for a story about plaintiff—constitutes an illegal act or tort under the New York law.
Plaintiff principally relies on two cases to support his argument that The Times' conduct qualifies as a tort. Plaintiff argues that The Times' conduct is not constitutionally protected under Le Mistral, Inc. v. Columbia Broadcasting System, a case that established that "[c]rimes and torts committed in news gathering are not protected by the First Amendment" (61 AD2d 491, 494 [1st Dep't 1978]). But other than offering one selective quote from Le Mistral, plaintiff does not engage further with the decision. In Le Mistral, the Appellate Division held that the First Amendment does not protect a defendant, who in order to report on a story, entered the plaintiff's private premises without permission, thereby committing a trespass. Despite numerous requests to leave, the reporter continued recording plaintiff's premises, and later claimed that the First Amendment protected his actions. The Appellate Division, in reviewing the lower court's order, disagreed with the defendant, holding that, considering the facts of the case, the reporter was not allowed to commit a trespass and then rely on the First Amendment to excuse his conduct (id.). Plaintiff also relies on United States v. Sanusi for a similar proposition (813 F Supp 149, 155 [EDNY 1992] [ordering CBS to disclose a videotape made when a reporter illegally trespassed in a criminal defendant's home to film the execution of a warrant)].
Here, plaintiff has not alleged any remotely similar facts. Plaintiff attempts to make an analogy between this action and the trespass cases by arguing that Craig engaged in illegal activity because she "directed" Mary Trump to pilfer documents against the advice of her attorney. But Mary Trump's book—which plaintiff concedes is incorporated into the complaint—demonstrates that Mary Trump's attorney gave her permission to take those documents (opening br. ex. B at 187). More importantly, plaintiff does not dispute this critical point: Mary Trump owned the files she disclosed to The Times, and thus there was nothing wrongful about Craig requesting them (Bronx Jewish Boys v. Uniglobe, Inc., 633 NYS 2d 711, 713 [Sup Ct NY Cnty 1995] ["[A]ttorneys have no possessory rights in the client files. In other words, the file belongs to the client"]). Given these facts, the trespass cases that plaintiff relies on are inapposite.
Plaintiff does not cite a single case where any court, whether state or federal, has held that a reporter is liable for inducing his or her source to breach a confidentiality provision. In fact, New York courts have consistently rejected efforts to impose tort liability on the press based on allegations that a reporter induced a source to breach a non-disclosure agreement. In Highland Capital v. Dow Jones & Company, Inc., the First Department affirmed dismissal of an investment adviser's claim that a Wall Street Journal reporter engaged in tortious conduct by obtaining information from employees bound by non-disclosure agreements (178 AD3d 572, 574 [1st Dep't 2019]). In doing so, the court highlighted that dismissal was appropriate because "defendants' conduct as alleged in the complaint was incidental to the lawful and constitutionally protected process of news gathering and reporting" (Highland Cap., 178 AD3d at 574 citing Bartnicki v. Vopper 532 US 514, 534]). Other New York decisions dismissing tortious interference claims against the press are in accord (see, e.g., Huggins v. NBC, 1996 WL 763337, at *4 [Sup Ct NY Cnty 1996] [dismissing tortious interference claims against NBC because "any [*9]interference that occurred was merely incidental to defendants' exercise of their constitutional right to broadcast newsworthy information"]).
Plaintiff argues that Highland does not support dismissal of his claims because the Highland court, in addition to dismissing plaintiff's tortious interference claim, further stated that "[t]he complaint also failed to cite to any specific confidentiality agreements that defendants knowingly induced their sources to violate" (Highland Cap., 178 AD3d at 574). This second part of the First Department's ruling, according to plaintiff, leaves open the question of whether that court would have ruled differently had the plaintiff actually identified the alleged confidentiality agreements breached — something that plaintiff indisputably does in his complaint.
But the fact that the Highland complaint failed for two reasons is irrelevant. The relevant holding in Highland is that dismissal was warranted because "defendants' conduct as alleged in the complaint was incidental to the lawful and constitutionally protected process of news gathering and reporting," and nothing in the decision suggests that this ruling hinges on the plaintiff's failure to adequately allege other elements of their claims (id.). In fact, the quote from the decision on which plaintiff relies includes the word "also," indicating that plaintiff's failure to cite to any specific confidentiality agreement is only an additional reason why the complaint failed ("[t]he complaint also failed to cite to any specific confidentiality agreements that defendants knowingly induced their sources to violate Highland Cap., 178 AD3d at 574]) [emphasis added]. Moreover, the Highland decision accords with the precedent established in the Huggins cases — a decision that plaintiff completely ignores.
Given the binding precedent of Highland Capital and the New York Constitution's strong protection of newsgathering, plaintiff's attempt to impose civil liability on The Times and its reporters lacks "a substantial basis in law" [CPLR 3211(g)] — and is contrary to the core principles that underlie the First Amendment and the New York State Constitution. Accordingly, the tort claims asserted against The Times and its reporters are dismissed in their entirety.
3. Did plaintiff allege the necessary elements of his tort claims?
Even if plaintiff's claims did not fail as a matter of constitutional law, they are subject to dismissal due to plaintiff's failure to allege the necessary elements under New York common law. Plaintiff's tortious interference claim fails because The Times' purpose in reporting on a story of high public interest constitutes justification as a matter of law. Plaintiff's unjust enrichment claim fails because it is duplicative of his other claims, while his claim for negligent supervision fails due to such claims being reserved only for situations where employees commit torts outside the scope of their normal work duties.
a. Tortious interference with a contract 
To state a claim for tortious interference, a plaintiff must allege "[i] the existence of a valid contract between the plaintiff and a third party, [ii] defendant's knowledge of that contract, [iii] defendant's intentional procurement of the third-party's breach of the contract without justification, [iv] actual breach of the contract, and [v] damages resulting therefrom" (Lama Holding Co v. Smith Barney Inc., 88 NY2d 413, 424 [1996]). Plaintiff's tortious interference claim is dismissed because The Times defendants' purpose in reporting on a newsworthy story constitutes justification as a matter of law.
Justification provides an absolute defense to a tortious interference claim (Huggins v. Povitch, 1996 WL 515498 [Sup Ct NY Cty 1996]). New York courts have consistently held that the right to engage in newsgathering activities constitutes such justification. In Povitch, the court [*10]dismissed a tortious interference claim against Maury Povitch — a syndicated talk show host — for inducing plaintiff's ex-wife to speak about their divorce proceedings during his talk show, in violation of a confidentiality provision in the couple's divorce settlement. Defendant Povitch was previously put on notice as to the non-disclosure provision but decided to disregard the notice and proceed with the interview. In dismissing the claim against Povitch, the court adopted the defendant's argument that the First Amendment freedom of the press to report on newsworthy subjects is an appropriate justification that will preclude a claim of tortious interference. More specifically, the court declared that it agreed that:
" a broadcaster whose motive and conduct is intended to foster public awareness or debate cannot be found to have engaged in the wrongful or improper conduct required to sustain a claim for interference with contractual relations. Here the broadcaster's first amendment right to broadcast an issue of public importance, its lack of any motive to harm the plaintiff, and the obvious societal interest in encouraging freedom of the press, negate essential elements of the tort" (Povitch, 1996 WL 515498, at *9).
Previously, and utilizing the same reasoning, the court also dismissed a tortious interference claim against NBC for purportedly inducing the same woman to breach the same confidentiality provision and discuss publicly her divorce proceedings with the same plaintiff (Huggins v. NBC, 1996 WL 763337, at *4 [Sup Ct NY Cty 1996]). Other jurisdictions are in accord with the New York law (see, e.g., Seminole Tribe of Fla v. Times Publ'g Co., 780 So2d 310, 317-18 (Fla Ct App 2001) [dismissing a tortious interference claim against reporters for soliciting tribal employees to reveal confidential documents about the tribe's gambling operations and explaining that reporters' conduct was "routine news gathering"]; Jenni Rivera Enters., LLC v. Latin World Ent Holdings, Inc., 36 Cal App 5th 766, 800 [Ct. App. 2019] [dismissing a tortious interference claim against a broadcaster for reporting confidential information obtained from the plaintiff's former manager in violation of a nondisclosure agreement, because the broadcaster's actions were "not sufficiently 'wrongful' or 'unlawful' to overcome the First Amendment newsgathering and broadcast privileges"]).
In his opposition papers, plaintiff does nothing to contradict or distinguish any of the cited cases. Instead, plaintiff cites a single case, Lindberg v. Dow Jones, in which a federal judge permitted the plaintiff to amend his complaint as it relates to a tortious interference claim, on the basis that factual questions may exist regarding whether the defendant publishers' conduct was justified (2021 WL 5450617). In Lindberg, however, the district judge applied the federal pleading standard—not CPLR 3211(g)—and expressly declined to apply the First Department's protection for conduct that is "incidental to the lawful and constitutionally protected process of news gathering and reporting," in favor of a balancing test set forth in Jews for Jesus v. Jewish Cmty Rels Council [FN4]
(Lindberg, 2021 WL 5450617 at *8 n.92).
This court, however, must, and will apply the reasoning of the First Department's decision in Highland, which is also in accord with other New York decisions, holding that "the First Amendment freedom of the press to report on newsworthy subjects is an appropriate justification that will preclude a claim of tortious interference" (Povitch, 1996 WL 515498, at *9; Huggins, 1996 WL 763337, at *4)]. Accordingly, because The Times defendants were [*11]undisputedly engaged in routine newsgathering, plaintiff's tortious interference claim is dismissed.
b. Aiding and abetting tortious interference with contract
Plaintiff's claim for aiding and abetting is likewise dismissed. Considering that plaintiff is unable to allege the tortious interference cause of action — a primary violation necessary to sustain this claim — the cause of action for aiding and abetting is likewise dismissed.
c. Unjust enrichment
Plaintiff's claim for unjust enrichment is dismissed because it is impermissibly duplicative of plaintiff's tortious interference with contract claims. Plaintiff does not even contest this argument. Where he has not addressed the arguments for dismissal of a claim, a plaintiff has conceded that the claim should be dismissed (see Chiomenti Studio Legale, LLC v Prodos Cap Mgmt LLC, 2015 WL 1095700, at *9 [Sup Ct NY Cnty 2015] ["Since defendants have not responded to the motion regarding the grounds for the dismissal of the defenses and counterclaims, the court shall deem this as a[n] admission that they lack merit or are insufficiently pleaded"]. Thus, plaintiff has waived any opposition to The Times defendants' argument.
Plaintiff vaguely argues that The Times defendants were enriched at his expense because the 2018 Article describes his "dubious tax schemes" and mentions the estate proceedings (Opp Br at 16). But plaintiff's refusal to identify the harm he suffered prevents him from sufficiently alleging enrichment at his expense. This independently warrants dismissal of his unjust enrichment claim.
d. Negligent supervision
Plaintiff's claim for negligent supervision fails due to such claims being reserved only for situations where employees commit torts outside the scope of their normal work duties.
The necessary elements of a cause of action alleging negligent retention or negligent supervision are: "(1) that the tort feasor and the defendant were in an employee employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels" (Ehrens v. Lutheran Church, 385 F3d 232, 235 [2d Cir 2004]). However, the negligent supervision claim is reserved only for those situations where employees commit torts outside their normal duties (Scollar v. New York, 160 AD3d 140, 147-48 [1st Dep't 2018]). Here, the reporter defendants engaged in newsgathering activities that were a key part of their role as Times reporters (Nicholson v. McClatchy Newspapers, 177 Cal App 3d 509, 519 [1986] ["asking person questions, including those with confidential or restricted information" is a "routine reporting technique"]). Given that the reporter defendants' conduct occurred within the scope of their employment, the negligent supervision claim must be dismissed. As with the unjust enrichment claim, plaintiff admits that "all of" the reporter defendants' "actions were taken in the scope of their employment" [Opp Br at 18], thereby admitting this claim's invalidity.
4. Are The Times defendants entitled to costs and attorneys' fees?
As explained above, New York's anti-SLAPP law applies to this lawsuit because it "is an [*12]action involving public petition and participation" as defined in section 76-a(1)(a) of the New York Civil Rights Law. Therefore, due to dismissal of the claims asserted against The Times and its reporters, The Times defendants are entitled to recover their costs and attorneys' fees.

 CONCLUSION
Accordingly, it is
ORDERED that The Times defendants' motion (sequence number 003) to dismiss the complaint as against them is granted; and it is therefore
ORDERED that the complaint is hereby dismissed as to defendants The New York Times Company, Susanne Craig, David Barstow and Russell Buettner; and it is further
ORDERED that the Fourth, Fifth, Sixth and Seventh Causes of Action are hereby dismissed with prejudice; and it is further
ORDERED that plaintiff Donald Trump shall forthwith pay the accumulated attorneys' fees, legal expenses and costs of the defendants The New York Times Company, Susanne Craig, David Barstow and Russell Buettner to such defendants, pursuant to and in accordance with the provisions of NY Civil Rights Law § 70-a(1)(a).
May 3, 2023
ROBERT R. REED, J.S.C.

Footnotes

Footnote 1: See, e.g., Today, Donald Trump on New Hampshire Win (Full Interview), YouTube, at 3:45-51 (Feb. 10, 2016), https://youtu.be/vQal9FMbkcw (Q: "Real quickly. When are you going to release your tax returns?" Trump: "Probably over the next few months. They're being worked on right now."); Meet the Press, NBC News (Jan. 24, 2016), https://www.nbcnews.com/meet-the- press/meet-press-january-24-2016-n503241 (Q: "Will you release any of your tax returns for the public to scrutinize?" Trump: "Well, we're working on that now. I have very big returns, as you know, and I have everything all approved and very beautiful and we'll be working that over in the next period of time, Chuck. Absolutely."); Virgin Media Television, Colette Fitzpatrick Meets Donald Trump!, YouTube, at 1:29-1:45 (May 20, 2014), https://www.youtube.com/watch?v=Hg- 5KEt1Abg ("If I decide to run for office, I'll produce my tax returns, absolutely. And I would love to do that.").
Footnote 2: NYSCEF Doc. No. 46 at 8 citing James D. Zirin, Plaintiff in Chief: A Portrait of Donald Trump in 3,500 Lawsuits, at xi (2019) (analyzing 3,500 lawsuits involving Trump and describing how he "sued as a means of destroying or silencing those who crossed him" and "to make headlines, for the entertainment value, and to reinforce his power over others"); Donald Trump: Three Decades, 4,095 Lawsuits, USA Today, https://www.usatoday.com/pages/interactives/trump-lawsuits (last accessed Dec. 1, 2021)
Footnote 3: Civil Rights Law §76-a (2) applies specifically to a cause of action for defamation and it states the following:
In an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.
Footnote 4: See Jews for Jesus v. Jewish Cmty Rels Council, 968 F2d 286, 292-93 (2d Cir 1992).